229 N.W.2d 3 (1975)
BROTHERHOOD OF RAILWAY AND STEAMSHIP CLERKS, FREIGHT HANDLERS, EXPRESS AND STATION EMPLOYEES, LODGE 364, Appellant,
Burlington Northern, Inc., Appellant,
v.
STATE of Minnesota, By Conrad BALFOUR, Commissioner, and His Successor, Samuel L. Richardson, Commissioner, Department of Human Rights, Respondents.
Nos. 44750, 44760.
Supreme Court of Minnesota.
February 28, 1975.
Rehearing Denied May 1, 1975.
*5 Hvass, Weisman & King, Si Weisman, and Richard A. Williams, Jr., Minneapolis, for Broth. of Railway and Steamship Clks., etc.
Frank S. Farrell and Reginald Ames, St. Paul, for Burlington Northern, Inc.
Warren Spannaus, Atty. Gen., Peter Sipkins, Solicitor Gen., Bruce W. Okney, Sp. Asst. Atty. Gen., Minneapolis, for respondents.
Heard before SHERAN, C. J., and KELLY and TODD, JJ., and considered and decided by the court en banc.
TODD, Justice.
Petitioners, Brotherhood of Railway and Steamship Clerks, Freight Handlers, Express and Station Employees, Lodge 364 (union), and Burlington Northern, Inc. (railroad), appeal from an order of the district court denying their motions for amended findings of fact, conclusions of law, and order for judgment. The lower court affirmed the conclusion of the hearing examiner, duly appointed by the commissioner of human rights, that the petitioners engaged in unfair discriminatory practices. The lower court also affirmed the granting of remedial relief, consisting of an equalization of seniority rights and the award of backpay to the employees affected by the discrimination, and the hearing examiner's order that petitioners desist from engaging in unfair discriminatory practices against employees of the railroad and members of the union. The lower court modified the hearing examiner's order with respect to the union's right to seek contribution from the railroad, ordering the railroad to contribute 50 percent of the damages awarded. Only the railroad challenges the modification of the order regarding allocation of damages. We affirm as to the establishment of seniority rights and the right to backpay, modify the lower court's backpay *6 order by limiting the award of backpay to the 2-year period preceding the date of the filing of the petition, and reinstate the hearing examiner's finding with reference to contribution by the railroad.
These proceedings involve alleged discrimination against two black employees of the railroad, Thomas Shelby and James Walker. With respect to Thomas Shelby, the hearing examiner found that he commenced work with the railroad on January 21, 1953, as a building porter and remained in the employ of the railroad until March 20, 1969, performing work as, among other things, a building porter, a car cleaner, and a news clerk. While working as a building porter, Shelby performed work which was the same as that of a janitor within the scope of the collective bargaining agreement entered into between the railroad and the union in 1946. As a janitor, Shelby was entitled to membership in the union 60 days after he commenced work with the railroad and he should have been required to join the union pursuant to the union shop rule which governed membership in said union. His work as a car cleaner was that of a cleaner within the scope of the collective bargaining agreement.
In February 1954, Shelby, then a car cleaner, applied for membership in the union. However, the union refused to admit him on the ground that his work was outside the scope of the 1946 agreement. The hearing examiner rejected this argument and found the refusal to be a direct result of racial discrimination. The job classifications as drawn and maintained by the railroad and union were the product of a system designed to perpetuate the racial membership policies of the union. On February 1, 1957, Shelby filed a complaint against the union with the Fair Employment Practices Commission (FEPC) of the State of Minnesota.
On January 15, 1958, the railroad and the union entered into an agreement regarding the inclusion of Shelby within the collective bargaining unit.[1] The hearing examiner found that the representatives of the union and railroad who negotiated this agreement, as well as the 1946 agreement and one made in 1960 relating to the admission of Walker to membership in the union, were skillful, experienced negotiators who drafted said agreements with full knowledge of the job classification system utilized by the railroad and the membership policies governing the union. He found that the specific agreements with which this proceeding is concerned were the product of a concerted effort by these negotiators, who knew that the 1958 and 1960 agreements curtailed valuable rights of Shelby and Walker, rights enjoyed by Caucasian members of the union.
*7 Shelby testified that he took no part in negotiating the settlement agreement and that the substance of the agreement was never described to him. He never consented to the terms of the settlement agreement. The hearing examiner found that the FEPC was not acting as an agent for Shelby in negotiating the settlement and could not bind him to the terms of the settlement. The FEPC was apparently satisfied with the agreement and closed its file, marking the case "satisfactorily adjusted." The FEPC in 1958 was not empowered to approve the settlement agreement, either by statute or by Shelby. Its functions included hearing Shelby's complaint, but it could only attempt to eliminate discriminatory practices "by means of education, conference, conciliation, and persuasion." L.1955, c. 516, § 7, subd. 1(10), Minn. St.1957, § 363.05, subd. 1(10).
The only complaint then before the FEPC was that the union was denying Shelby membership because of his race. Thus, the single goal of the agency was achieved by the inclusion of Shelby within the collective bargaining relationship. The FEPC gave little consideration to other terms of the agreement and failed to examine them for their discriminatory effect.
As a result of the agreement, Shelby found his pay reduced, since the hourly rate negotiated by the railroad and the union was 28 cents per hour less than Shelby was being paid at the time. It is true that Shelby received some fringe benefits, but their value did not equal the amount he lost by the decrease in his compensation. Further, Shelby was granted job seniority as of the date of the agreement, not as of the date of his employment. Moreover, he was "ringed in" by the provision that if he ever left his job as a cleaner, he would lose his seniority. The examiner found the reduced wage rate and the failure to grant Shelby seniority from the day he was hired to be discriminatory. Shelby, upon being advised of the terms of the agreement, began complaining to union officials about its discriminatory effects. He was later joined in these complaints by James Walker. The record is clear that both employees vigorously asserted their objections to numerous union officials and raised them at open meetings of the union.[2] The examiner found that the failure of the union to act upon these complaints was an aspect of racial discrimination.
The situation with respect to James Walker is similar. He commenced work with the railroad in the fall of 1954 and began working as a building porter in the commissary building on February 25, 1955, continuing to work as a building porter until the position was abolished in 1967. The examiner found that he performed the same work as a janitor and that the failure of the union to admit Walker into membership within 60 days of his employment was a result of racial discrimination. On October 3, 1960, Walker was permitted to join the union following intervention by the FEPC. An agreement was reached between the union and the railroad, patterned after the Shelby agreement. As a result of the agreement, Walker's wages were reduced by approximately 25 cents per hour, his seniority was established as of the date of the agreement, and he was "ringed in" to the job classification of building porter. Walker was not a party to the negotiations, nor did he know of, approve of, or consent to the settlement terms. He joined with Shelby in registering protests at union meetings and in discussions with various union officials.
On May 16, 1966, Shelby and Walker each filed a charge of discrimination with the State Commission Against Discrimination (SCAD), the successor agency to the FEPC, which ultimately became the Department of Human Rights. The original charges were brought against the union, alleging *8 that Shelby's and Walker's memberships were not equal to those of other members of the union. On November 26, 1968, amended charges of discrimination were filed against the union and the railroad, and the commissioner of human rights thereafter issued a formal complaint. The matter was assigned to a hearing examiner, who heard evidence and filed his findings of fact, conclusions of law, and order, and a memorandum on March 15, 1972. The union and railroad filed separate petitions for judicial review in the district court, seeking to set aside the order of the hearing examiner.
On this appeal, this court is asked to consider the following issues: (1) Is there sufficient evidence to support the finding that the railroad and the union committed unfair discriminatory practices in violation of Minnesota statutes? (2) Is the Department of Human Rights estopped from bringing action against the railroad and union for alleged discriminatory acts occurring in 1958 and 1960, where its predecessor agency, the Fair Employment Practices Commission, took some part in the settlement agreements? (3) Are the charges filed with the State Commission Against Discrimination in 1966 barred by the 6-month statute of limitations, where the alleged discriminatory acts occurred in 1958 and 1960? (4) Under the provisions of the 1965 act, was the hearing examiner empowered to award backpay in view of the 1969 amendments which specifically authorized such an award? (5) If backpay is authorized, for what period of time may it be awarded under the appropriate Minnesota statutes? (6) Is there sufficient evidence to support the trial court's determination that the railroad was equally responsible with the union for the backpay to petitioners?
1. As this appeal came before the district court on review of a decision of a state administrative agency, its scope of review was governed by the provisions of Minn.St. 15.01 to 15.41, the Administrative Procedure Act. The relevant provision is Minn.St. 15.0425, which provides in part as follows:
"* * * [T]he court may affirm the decision of the agency or remand the case for further proceedings; or it may reverse or modify the decision if the substantial rights of the petitioners may have been prejudiced because the administrative finding, inferences, conclusion, or decisions are:
* * * * * *
"(b) In excess of the statutory authority or jurisdiction of the agency; or
* * * * * *
"(e) Unsupported by substantial evidence in view of the entire record as submitted; or
"(f) Arbitrary or capricious."
Our review of the findings of fact, conclusions of law, and order of the district court must apply the standard of whether they are clearly erroneous. In re Estate of Balafas, 293 Minn. 94, 198 N.W.2d 260 (1972).

THE DISCRIMINATORY ACTS
2. The union generally challenges the sufficiency of the evidence to support the findings of the hearing examiner, and the railroad specifically challenges the findings of discrimination by the hearing examiner. The union argues that it was not guilty of discrimination, since by the terms of the 1946 agreement the classification of Shelby and Walker as porters and, in Shelby's case, as a car cleaner placed them outside the scope of the representation agreement. Thus, the union asserts that it was prohibited by the terms of the agreement from making them members of the union. The railroad argues that it was bound by the terms of the union agreement and had no voice in determining the membership of the union. The hearing examiner found that Shelby and Walker were performing the same work as janitors and, in Shelby's case, as cleaners as defined in the *9 agreement and were entitled to union membership. The hearing examiner rejected the argument of the union and concluded also that the railroad participated in the adoption of the agreements with full knowledge of its job classification system and the membership policies of the union.
Discrimination existed in the employment practices of the railroad as all blacks were limited to certain job classifications which the railroad and union specifically excluded from the representation agreement. However, the evidence disclosed that the work performed by the excluded blacks was the same as the work performed by union members. Such discrimination was prohibited by law, yet neither the union nor the railroad took any steps to modify their 1946 agreement. It was only after the employees themselves complained of exclusion and brought it to the attention of the state agency that any attempted correction of the discrimination took place. But again discrimination was to affect Shelby and Walker. The agreement of 1958, which brought Shelby union membership, was negotiated by representatives of the union and the railroad in the presence of the state agency. However, no attempt was made to involve Shelby, the complaining employee, in the settlement proposals. The proposals obviously satisfied the initial request made to the state agency, namely, that the employee be allowed union membership. Yet, an examination of the settlement agreement and of the 1960 agreement covering Walker discloses continuing discrimination. The employees were given union membership but at the price of reduction in pay. Seniority from the date of employment was disallowed and established for each employee as of the date of the pertinent agreement. Finally, a limitation was placed on the seniority established so that if they ever left their job classification, they would lose their entire seniority rights, a situation which did not exist with other members of the union.
3. Each of these discriminatory acts has a continuing effect upon the employees involved. The decrease in pay directly affects their pension benefits at the time of retirement. The order of the hearing examiner, as affirmed by the lower court, requires that pay reimbursements be reported to the Railroad Retirement Board so as to be reflected in the employees' pension benefits. The hearing examiner further found the discrimination in seniority to have a continuing effect, since the establishment date has a direct daily effect upon the employment position of the affected employees. Shelby and Walker were entitled to union membership as of the date they were hired, and their seniority should have been established at that time. To defer their seniority to a later date merely perpetuated the effect of the racial discrimination.
The Federal courts, in deciding cases under Title VII of the 1964 Civil Rights Act, 42 U.S.C.A. § 2000e et seq., have had occasion to comment on this situation. In United States v. Local 189, United Papermakers & Paperworkers, AFL-CIO, CLC, 282 F.Supp. 39, 44 (E.D.La.1968), the court said:
"* * * Where a seniority system has the effect of perpetrating discrimination, and concentrating or `telescoping' the effect of past years of discrimination against Negro employees into the present placement of Negroes in an inferior position for promotion and other purposes, that present result is prohibited, and a seniority system which operates to produce that present result must be replaced with another system. We agree wholeheartedly with the conclusion in Quarles v. Philip Morris, Inc., 279 F.Supp. 505 (E.D.Va.1968), that present discrimination cannot be justified under Title VII simply because Title VII refers to an effective date and because present discrimination is caused by conditions in the past. `Congress did not intend to freeze an entire generation of Negro employees into discriminatory patterns that existed before the act.' Quarles, supra, at 516."
The Court of Appeals for the Fifth Circuit, in Local 189, United Papermakers & *10 Paperworkers, AFL-CIO, CLC v. United States, 416 F.2d 980, 988 (5 Cir. 1969), affirmed this decision and added the following statement:
"* * * Every time a Negro worker hired under the old segregated system bids against a white worker in his job slot, the old racial classification reasserts itself, and the Negro suffers anew for his employer's previous bias. It is not decisive therefore that a seniority system may appear to be neutral on its face if the inevitable effect of tying the system to the past is to cut into the employees present right not to be discriminated against on the ground of race."
Similarly, in United States v. Dillon Supply Co., 429 F.2d 800 (4 Cir. 1970), the court stated that Title VII is not limited to providing a remedy against present acts of racial discrimination. It is applicable on proof of any past specific or general act, practice, policy, or pattern of racial discrimination which has any present discriminatory effect. See, also, Marquez v. Omaha District Sales Office, Ford Division, 440 F.2d 1157 (8 Cir. 1971); Griggs v. Duke Power Co., 420 F.2d 1225 (4 Cir. 1970).
Likewise, the "ringed-in" effect of the settlement agreement has continuing discriminatory effects on the employees involved. A recent Fifth Circuit decision, Franks v. Bowman Transp. Co., 495 F.2d 398, 414 (5 Cir. 1974), most adequately summarizes the problem, the court there saying:
"When a departmental seniority system perpetuates the effect of past discrimination it is an unlawful employment practice proscribed and remediable under Title VII. E. g., United States v. Bethlehem Steel Corporation, 2nd Cir. 1971, 446 F.2d 652; Robinson v. Lorillard Corp., 4th Cir. 1971, 441 F.2d 791, cert. dismissed 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655; Local 189, United Papermakers and Paperworkers, AFL-CIO, CLC v. United States, supra, 416 F.2d 980; Quarles v. Philip Morris, Inc., E.D.Va.1968, 279 F.Supp. 505. Though not as drastic as a rigid no-transfer rule, a departmental seniority system discourages transfers and thereby locks a discriminatee into his inferior job by threatening him with loss of his accumulated seniority if he should transfer. `In any industry loss of seniority is a critical inhibition to transfer.' United States v. Jacksonville Terminal Co., 5th Cir. 1971, 451 F.2d 418, 453, cert. denied 406 U.S. 906, 92 S.Ct. 1607, 31 L.Ed.2d 815. That the system is racially neutral on its face does not save it under Title VII if its effect is to `cut into the employees' present right not to be discriminated against on the ground of race.' Local 189, supra, 416 F.2d at 988; see also United States v. Jacksonville Terminal Co., supra, 451 F.2d at 451. The federal courts' power to modify or suspend the operation of a discriminatory seniority system is not affected by the fact that the seniority system has been established in a private, collective bargaining agreement. Vogler v. McCarty, Inc., 5th Cir. 1971, 451 F.2d 1236. The only ground upon which a discrimination-perpetuating seniority system may be defended is that of business necessity. `When a policy is demonstrated to have discriminatory effects, it can be justified only by a showing that it is necessary to the safe and efficient operation of the business.' Jones v. Lee Way Motor Freight, 10th Cir. 1970, 431 F.2d 245, 249; see Robinson v. Lorillard Corp., supra, 441 F.2d at 797; Local 189, supra.

"In this case it is undisputed that the members of class 1 were originally relegated to inferior jobs in the Tire Shop as a result of Bowman's racially discriminatory hiring practices. Further, it is clear that the departmental seniority system has the forbidden effect of locking discriminatees into the pattern thus created. Neither Bowman nor the union has attempted to defend the seniority system as a `business necessity.' As the district court recognized, class 1 members are entitled to relief from the locking-in effect *11 of the departmental seniority system. The question presented is what form the remedy must take and how far it must go.
"The leading case in this circuit on seniority relief under Title VII is Local 189, United Papermakers and Paperworkers, AFL-CIO, CLC v. United States, 5th Cir. 1969, 416 F.2d 980, cert. denied 1970, 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100, aff'g, E.D.La.1969, 301 F.Supp. 906. There, Judge Wisdom endorsed for our Court the `rightful place' approach to seniority problems.
A `rightful place' theory stands between a complete purge of `but-for' effects [and] maintenance of the status quo. The Act should be construed to prohibit the future awarding of vacant jobs on the basis of a seniority system that `locks in' prior racial classification. White incumbent workers should not be bumped out of their present positions by Negroes with greater plant seniority; plant seniority should be asserted only with respect to new job openings. This solution accords with the purpose and history of the legislation.
Id. at 988. He concluded that the decree entered by the district court in that case accorded with the rightful place interpretation of the Act. That decree `permanently abolished' the offending `job seniority system' and allowed discriminatees to compete for jobs on the basis of `mill seniority,' which was to be computed from the beginning of the employee's service at the mill, regardless of the job slot he occupied, up to the date of his bid. United States v. Local 189, United Papermakers and Paperworkers, AFL-CIO, CLC, E.D.La.1969, 301 F.Supp. 906, 919."
Applying these principles, we affirm the holding that the employees' seniority should have been computed as of the date of their employment and that they are entitled to the same seniority rights as other union membersin other words, that they do not lose their plant seniority if they seek a transfer, but they obtain no departmental seniority at any time they seek a transfer into another division.
Lastly, the effect of establishing seniority at a later date than that to which the employees were entitled affects their right to retain their positions in the event of a layoff. In common labor relations parlance, the term "bumping" is used. This allows employees with plant seniority to maintain their employment during adverse economic conditions existing at the place of employment. Such a right is highly important and deserves the protection accorded it by the hearing examiner and the lower court. Further, neither the union nor the railroad advanced any business necessity which required the classification attempted to be imposed upon the employees here involved.

REOPENING THE PRIOR SETTLEMENT AGREEMENT
4. In considering this issue, we have carefully reviewed the 1958 proceedings which formed the basis of the so-called agreements on behalf of Shelby and Walker. We conclude that the union and the railroad misconstrued the proceedings being conducted at that time. The issue before the FEPC was admission to the union. The questions of seniority and backpay were not considered, except as delineated in the agreements negotiated by the union and railroad without the participation of the affected employees. The function of the FEPC in 1958 and in 1960 was to effectuate negotiations between the parties to seek elimination of unlawful discrimination by means of education, conference, conciliation, and persuasion. The FEPC was not empowered to approve the settlements, either by statute, or by Shelby or Walker. In closing Shelby's file as "satisfactorily adjusted" the FEPC was acting in an administrative capacity only and disposed of the sole issue before it, namely, admission to the union. Thus, we regard the reliance by the railroad and the union on Anchor Cas. *12 Co. v. Bongards Co-op. Creamery Assn., 253 Minn. 101, 91 N.W.2d 122, 73 A.L.R.2d 933 (1958), to be misplaced. That case stands for the proposition that the jurisdiction of administrative agencies to reverse their adjudications which appear to be erroneous lasts until jurisdiction is lost by appeal or certiorari or until a reasonable time has run which would be at least coextensive with the time required by statute for review. However, as the issue here under consideration was not considered in the 1958 proceedings, the commissioner of human rights, as the successor of the State Commission Against Discrimination, is not precluded from investigating the settlement agreements.
In addition, neither the union nor the railroad has shown any prejudice resulting from the state's scrutiny of the 1958 and 1960 agreements. If the pay rates set in the agreements were discriminatory, the union and railroad are only being required to repay what they illegally withheld. And the compelling of a seniority date based on plaintiffs' employment date will merely restore plaintiffs to the seniority positions which they deserve. The union asserts that its "good faith reliance" on the finality of the settlement agreements has resulted in "great detriment to its legitimate interests." The asserted elements of "good faith" and "legitimate interests" are lacking. Also, as the hearing examiner's order is framed so as to place Shelby and Walker in the positions they would have been in but for the discrimination of the union and railroad, there is no showing of "great detriment."
Finally, reliance on the doctrine of equitable estoppel is misplaced. The agreements sought to be upheld were the product of racial discrimination and worked to perpetuate it. Illegal agreements (or those void as against public policy) will not be validated by resort to an equitable remedy. See, Seitz v. Michel, 148 Minn. 80, 181 N.W. 102 (1921).

THE 6 MONTHS' STATUTE OF LIMITATIONS
5. Minn.St. 363.06, subd. 3, provides that "[a] charge of an unfair discriminatory practice must be filed within six months after the occurrence of the practice." The union and railroad argue that, assuming the settlement agreements of 1958 and 1960 were discriminatory, the charges filed by Shelby and Walker in 1966 were untimely. This argument can have validity only if the discriminatory acts of 1958 and 1960 are treated as single, isolated acts of discrimination. However, as we have previously concluded in this opinion, such acts were continuing in nature. Thus, the charges asserted in 1966 are not barred by the statute of limitations.
We have had one occasion to consider the effect of the statute of limitations contained in § 363.06, subd. 3, in Richardson v. School Board of Independent School Dist. No. 271, 297 Minn. 91, 210 N.W.2d 911 (1973). That case involved the alleged discriminatory practice of school boards in discharging pregnant teachers. A class action was brought by the commissioner of human rights to prevent such acts of discrimination. We there held that such an act of discharge was a single discriminatory practice, not continuing in nature, and that only persons who had been discharged within 6 months of the date of the commission's suit could be included in the class action. We indicated in that opinion that acts continuing in nature would toll the statute of limitations. We did not define specifically what act would constitute a continuing act of discrimination. For purposes of this opinion, we hold that the settlement agreements of 1958 and 1960 constituted continuing acts of discrimination and that the employees' charges filed in 1966 were properly before the commissioner of human rights. This holding is consistent with Federal cases interpreting Title VII of the Civil Rights Act of 1964. See, United States v. Local 189, United Papermakers & Paperworkers, AFL-CIO, CLC, supra; United States v. Dillon Supply Co. supra; Griggs v. *13 Duke Power Co. supra; United States v. Georgia Power Co. 474 F.2d 906 (5 Cir. 1973).

ALLOWANCE OF BACKPAY
6. The hearing examiner awarded Shelby and Walker backpay to the time of their respective settlement agreements. The union and the railroad challenge the authority of the hearing examiner to award any backpay upon charges filed in 1966. Minn.St.1965, § 363.07, subd. 4, provided:
"Subd. 4. If the commission finds that the respondent has engaged in an unfair discriminatory practice, it shall make findings and shall issue an order directing the respondent to cease and desist from the unfair discriminatory practice found to exist and to take such other affirmative action as in the judgment of the commission will effectuate the purposes of this chapter and shall serve the order on the respondent personally, and the complainant by registered mail."[3]
The statute was amended in 1969 by adding the provision that, in cases of discrimination in employment, the examiner may order the hiring, reinstatement, or upgrading of an employee with or without backpay. L.1969, c. 975, § 11, Minn.St. 363.071, subd. 2(a). The union and the railroad argue that this amendment indicates that there was no power to award backpay at the time the complaints were filed and thus the award is invalid. The state contends that the broad language of the 1965 statute authorized the award of backpay as an element of affirmative action and that the 1969 amendment merely was a clarification of the existing law. Alternatively, the state argues that the 1969 amendment should apply to these proceedings, since the hearing was not commenced until after the effective date of the statute, which the state asserts applies to all pending hearings.
Generally, the adoption of an amendment raises a presumption that the legislature intended to make some change in the existing law. Western Union Tel. Co. v. Spaeth, 232 Minn. 128, 44 N.W.2d 440 (1950). However, we conclude that in this case the language of the amendatory statute was drafted to clarify rather than to enlarge the broad powers granted pursuant to the 1965 statute. Such an interpretation is consistent with the general purpose of Minn.St. c. 363, which is to place individuals discriminated against in the same position they would have been in had no discrimination occurred.
Having disposed of this issue upon the above grounds, we need not consider the alternative proposal advanced by the State of Minnesota.

EXTENT OF BACKPAY ALLOWANCE
7. The hearing examiner, as indicated previously, allowed backpay to the time of the original settlement agreements of Shelby and Walker. The union and the railroad, while arguing that no backpay allowance is valid, contend that if one is made, it must be limited to 2 years as provided in Minnesota's statute of limitations for wage claims, Minn.St. 541.07(5). Federal decisions sustain the position advocated by the union and railroad. See, United States v. Georgia Power Co. supra; Johnson v. Goodyear Tire & Rubber Co. 491 F.2d 1364 (5 Cir. 1974). These cases have awarded backpay under Title VII of the Federal act, limiting the period of recovery to the state's statute of limitations for wage claims, even though the discriminatory act occurred prior to such limited period. We are in accord with the rationale of this result since it represents a balance between the legislation prohibiting discriminatory practices and the legislation limiting the time for making claims for past wages. Admittedly, such a limitation does not place the employees in the same position as if no *14 act of discrimination had occurred. However, such employees are in the same position as any other employees who had back wages due them but waited too long to make a claim. They cannot be restored to the position they would have enjoyed had the wages been paid when due, but are limited to the period of limitations established by our legislature. We think this policy determination of the legislature must be applied uniformly to all classes of employees. Therefore, we hold that the backpay claims of Shelby and Walker must be limited to a period of 2 years prior to the date of the filing of their original charges in 1966.

AMENDMENT OF CONTRIBUTION AWARD
8. The hearing examiner, in awarding backpay to Shelby and Walker, charged the union with the entire amount of the award and allowed them to seek contribution from the railroad for such backpay as had accrued within 6 months of the commencement of the proceedings under consideration. The district court, in reviewing the hearing examiner's determinations, permitted the union to seek contribution from the railroad for 50 percent of the backpay award. The trial court found there was insufficient evidence to support the hearing examiner's findings of fact that Shelby had discussed his dissatisfaction with company representatives; that his complaints to the union were more numerous than his complaints to the railroad; that the union should have been more aware of his complaints and that the union had an obligation to initiate meaningful action to rectify the discriminatory aspects of the settlement; and that the union was continually made aware of the dissatisfaction of both Shelby and Walker.
In its conclusions of law, the district court held that, with the exception of the matters relating to contribution, the conclusions of the hearing examiner were justified by the facts contained in the record. The trial court concluded that the union was entitled to a 50-percent contribution from the railroad, but submitted no memorandum on the contribution issue which would assist this court in understanding the trial court's evaluation of the testimony. As indicated earlier in this opinion, the Administrative Procedure Act clearly limits the scope of review of the lower court. A careful review of the evidence presented to the hearing examiner discloses that his conclusion regarding the contribution obligation of the railroad is supported by substantial evidence in view of the entire record as submitted and is not arbitrary or capricious. Therefore, we hold that the order of the hearing examiner as to contribution by the railroad, limiting its obligations to backpay wages due within 6 months of the filing of the petition, should be reinstated, and that the finding of the district court rejecting this particular finding of the hearing examiner was clearly erroneous.
Affirmed in part; reversed in part; and remanded for amendment of the order for judgment consistent with this opinion.
OTIS, J., took no part in the consideration or decision of this case.
NOTES
[1] FEPC minutes reflect the six points to be contained in the agreement:

"1. The position of cleaner occupied by Mr. Shelby will be considered as being included within the scope of the Clerks' Agreement commencing with January 16, 1958.
"2. Mr. Shelby will be granted a Class `B' seniority date on the St. Paul Division as of January 16, 1958.
"3. Mr. Shelby will be immune from displacement in the exercise of seniority by other employees so long as he continued to be permanently assigned to the position of cleaner. When Mr. Shelby permanently vacates the position of cleaner, he will lose his immunity from displacement as herein provided for.
"4. Commencing with January 16, 1958, the position of cleaner occupied by Mr. Shelby will be assigned to work eight hours per day, Wednesday through Sunday, with Monday and Tuesday as rest days.
"5. Effective January 16, 1958, a basic rate of $1.79 per hour is established for the position of cleaner assigned to Mr. Shelby, which basic rate is subject to the provisions of the agreement dated November 1, 1956 entered into between the participating carriers represented by the Eastern, Western and Southeastern Carriers' Conference Committees and the Employees represented by the Railway Labor Organizations through the Employes' National Conference Committee, Eleven Cooperating Railway Labor Organizations.
"6. The inclusion of the position of cleaner within the scope of the Clerks' Agreement will not be construed as an obligation to maintain this position nor as restricting the Railway Company's right to discontinue this position."
[2] There is some evidence in the record that the railroad also was aware that the employees were dissatisfied.
[3] This provision was first enacted in 1955 (L.1955, c. 516, § 9) was repealed in 1967 (L.1967, c. 897, § 29), but was substantially reenacted as Minn.St.1967, § 367.071, subd. 2.