In the present case, the disputes over contract interpretation were genuine, and the defenses urged by the defendants were not frivolous or advanced vexatiously or for oppressive reasons. On the issue of bad faith, as on the other factual issues, the trial court is in the best position to make a determination.

The trial court is therefore affirmed.

**Lucille A. DODGE, et al., Plaintiffs,**

**Catherine Wermlund, Margaret Hankes and Mary P. Peterson, Appellants,**

v.

**MINNESOTA MINING AND MANUFACTURING COMPANY, Respondent.**

**No. 47665.**

Supreme Court of Minnesota.

April 6, 1979.

---

13. This exception has now been enacted into law. L.1978, c. 738, § 5 (codified at Minn.St. 549.21).

Ruttenberg, Orren Griswold & Bernet and Kenneth P. Griswold and Lee A. Bernet, III, St. Paul, for appellants.

Oppenheimer, Wolff, Foster, Shepard & Donnelly, Thomas P. Kane, Samuel E. Wetterlin and Keith E. Goodwin, St. Paul, for respondent.

Heard before KELLY, YETKA, and SCOTT, JJ., and considered and decided by the court en banc.

YETKA, Justice.

This is an appeal by plaintiffs Margaret Hankes, Mary Peterson, and Catherine Wermlund from judgment entered pursuant to an order of Ramsey County District Court, finding that defendant Minnesota Mining and Manufacturing Corporation had engaged in employment practices that discriminated on the basis of sex but denying these three plaintiffs back pay and other relief on the ground that they had suffered no damages as a result of such practices. We affirm.

The issues raised on this appeal are:

1. Did the trial court err by finding that appellants were not entitled to damages (back pay and credits for lost vacation and retirement benefits) because their staying in women's jobs was not caused by defendant's discriminatory practices?

2. Did the trial court violate Minn.St. 1974, § 363.14, by taking jurisdiction where the case was brought more than 90 days after notice to the charging parties that the commissioner had found no probable cause?[1]

The facts as stated herein are disputed only as to the effect of defendant's discriminatory practices on appellants.

Until December 1969, defendant maintained two classifications of jobs at its Chemolite plant: "A" jobs and "B" jobs. The "A" jobs were almost exclusively male, were referred to as "men's jobs," and were not open to women. The "B" jobs were almost exclusively female and were referred to as "women's jobs." Those who held the "A" jobs were paid more and were less susceptible to layoff than those who held "B" jobs.

In addition, defendant used a departmental seniority system. An employee's departmental seniority date was used to determine order of layoffs within a given department. When an employee—male or female—took a job in a new department, he or she would lose all seniority in the former department and would become the youngest member of the new department.

In December 1969, pursuant to an agreement between defendant and the Equal Employment Opportunity Commission (EEOC), women were given the right to apply for "A" jobs. This agreement did not change any of the other employment practices at Chemolite, including the departmental seniority system. Thus, a female employee who accepted an "A" job in a department other than her own would lose all of her acquired departmental seniority.

In October 1970, pursuant to another agreement with EEOC, defendant amended its collective bargaining agreement to ameliorate loss of departmental seniority when a "B" employee moved to take an "A" job. In October 1973, the policy that employees on layoff were not allowed to post for plantwide job openings was eliminated. Generally female employees did not know of either of these changes until defendant gave appropriate notice in February 1974.

Many of the women who accepted "A" jobs were subjected to incidents of harassment and intimidation by male employees. Although these incidents were reported to defendant's supervisory personnel, no steps were taken to eliminate these incidents. On at least two occasions, female employees were given inaccurate or misleading descriptions of "A" jobs—descriptions that led these female employees to believe that the job was far too physically demanding for them or that the male employees would harass them and interfere with their work. Based on these impressions, some female employees refused to accept these jobs.

1. This issue is raised by defendant's notice of review.

In November 1974, pursuant to agreement between defendant and the Atomic Energy Commission, the Federal contract compliance agent, defendant modified its collective bargaining agreement to eliminate the departmental seniority system, to provide for recall of women from layoff, and to allow women to post for "A" jobs according to their plant seniority. By the end of 1974, almost all plaintiffs desiring "A" jobs had been given such jobs when qualified.

On October 5, 1973, and November 27, 1973, several female employees (but not all of the plaintiffs) filed a charge with the Minnesota Department of Human Rights, alleging discrimination in employment on the basis of sex, violating Minn.St. 363.03, subd. 1(2). On March 19 and 21, 1974, the Human Rights Commissioner advised the charging parties that he had found no probable cause for a finding of discrimination by defendant. The notice sent to them included the following:

"If you believe that you are aggrieved by this decision, you may file an appeal with the state review board. The review board may either sustain the decision or remand the case for further investigation. To file an appeal, you must serve a written notice of appeal upon the Commissioner of Human Rights and the respondent within 15 days. You also have a right to initiate civil action against the respondent named in the charge filed with this Department. The action must be filed in the District Court wherein the unlawful discriminatory practice is alleged to have been committed or where the respondent resides or has his principal place of business. It must be filed within 90 days after the giving of this notice."

The charging parties appealed the commissioner's decision pursuant to Minn.St. 1974, § 363.06, subd. 7. On June 20, 1974, the review panel found the no probable cause finding to be erroneous and remanded the case to the department for further investigation. The department apparently did no further investigation. One of the attorneys for plaintiffs received a phone call from the deputy commissioner on September 30, 1974, and was informed that the department would adhere to its previous finding. The instant action, alleging discrimination by defendant and seeking both damages and injunctive relief, was filed on December 19, 1974.

On February 5, 1975, defendant moved for summary judgment on the ground that the district court lacked jurisdiction because plaintiffs did not file their complaint within 90 days of the March 1974 notice. The district court denied the motion on April 4, 1975, finding that, because of the appeal, the 90-day limitation did not begin to run until September 30, 1974, when plaintiffs learned of the department's "final" action. Trial of the case began on February 9, 1976, and lasted for 12 weeks. On October 25, 1976, the district court issued an order finding defendant had engaged in continuing violation of the state law against discrimination in employment on the basis of sex. Of the 18 plaintiffs, 10 were given back pay and restoration of retirement and vacation credits; the causes of action of five of the plaintiffs were dismissed without prejudice on procedural grounds; and three of the plaintiffs were denied damages on the ground that they were not damaged by the discriminatory practices. In addition, defendant was ordered to take affirmative action to eliminate any remaining effects of its discriminatory practices.

After the district court issued its October 25th order, defendant settled with 15 of the plaintiffs. The district court ordered the claims of these 15 plaintiffs dismissed with prejudice on December 8, 1976, and issued "Modified Findings of Fact, Conclusions of Law and Order for Judgment" on December 21, 1976. That judgment was entered on December 22, 1976. This appeal followed denial of a motion by the remaining three plaintiffs for amended findings of fact. Defendant has filed a notice of review of the denial of its motion for summary judgment.

■ 1. The trial court determined that appellants were not entitled to damages (back pay and credit for lost vacation and

retirement benefits) because they had remained in "B" jobs by choice, because of personal preference rather than because of defendant's discriminatory conduct. Appellants appeal that finding on the grounds that it is not justified by the evidence and that it imposes on plaintiffs a duty to resist or, at least, not to acquiesce in the discriminatory conduct of employers.

It is well established that when an action is tried by a court without a jury, its factual findings will not be reversed on appeal unless they are clearly erroneous, *Markoe v. Naiditch and Sons,* 303 Minn. 6, 8, 226 N.W.2d 289, 291 (1975), and that due regard will be given to the opportunity of the trial court to judge the credibility of the witnesses, *Peterson v. Johnston,* 254 N.W.2d 360, 362 (Minn.1977); Rule 52.01, Rules of Civil Procedure. Further, where the evidence is conflicting, it is the duty of the trial court to sift the evidence and determine the facts, and this court will not disturb the trial court's finding where there is evidence that reasonably supports that finding. *Peterson v. Johnston, supra.*

The trial court's finding that defendant discriminated against its female employees on the basis of sex did not automatically entitle all of defendant's female employees to recover damages. Each was required to show that, because of defendant's discriminatory practice, she suffered a loss.

The need for such individual determination was enunciated by the United States Supreme Court in *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 369, 97 S.Ct. 1843, 1871, 52 L.Ed.2d 396, 436 (1977): [2]

" * * * While the scope and duration of the company's discriminatory policy can leave little doubt that the futility of seeking line-driver jobs was communi-

cated to the company's minority employees, that in itself is insufficient. The known prospect of discriminatory rejection shows only that employees who wanted line-driving jobs may have been deterred from applying for them. It does not show which of the nonapplicants actually wanted such jobs, or which possessed the requisite qualifications. There are differences between city- and line-driving jobs, for example, but the desirability of the latter is not so self-evident as to warrant a conclusion that all employees would prefer to be line drivers if given a free choice. Indeed, a substantial number of white city drivers who were not subjected to the company's discriminatory practices were apparently content to retain their city jobs." [3] (Footnotes omitted.)

The purpose of this required showing is not to impose a "duty" on victims to fight discrimination; rather it is intended to limit payment of damages to those actually damaged.

In this case, all of the plaintiffs had lost pay and vacation and retirement benefits because of layoffs. It was the duty of the trial court to determine whether the layoffs of each plaintiff resulted from discrimination or from another cause. Appellants argue that their layoffs resulted from defendant's discriminatory practices because the atmosphere of threatened harassment and intimidation prevented them from taking "A" jobs. The trial court disagreed, however, finding that appellants did not take "A" jobs because they preferred "B" jobs or, as in the case of Mary Peterson, because the physical demands of the "A" job might endanger her health.

■ We must examine the record to determine whether there is evidence to sup-

---

**2.** *International Bhd. of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), was brought under Title VII of the Federal Civil Rights Act, 42 U.S.C.A. § 2000e, et seq. This court, however, has noted that the Federal act and the state act are similar and has relied on Federal case law to aid in its interpretation and application of the state law. See, *Danz v. Jones,* 263 N.W.2d 395 (Minn.

1978); *Brotherhood of Railway & Steamship Clerks v. State,* 303 Minn. 178, 229 N.W.2d 3 (1975).

**3.** Although the Teamsters case addressed the question whether certain employees were entitled to retroactive seniority, under the same reasoning, a showing of individual effect is required in order to recover back pay.

port the trial court's finding. Margaret Hankes, on direct examination, said that she was afraid ("in the same sense that I have never been bitten by a rattlesnake but I'm afraid of them"), that she didn't want to lose her seniority, and that she felt that the men had become quite hostile toward women who even looked at the postings of "A" job openings. But she also indicated that she preferred "B" jobs "because [she] felt [she] would be more comfortable," and, in fact, she chose layoff rather than the least senior "A" job in the plant. On cross-examination, counsel for defendant pointed out that Hankes had passed up numerous "A" job postings during the period from 1970 to 1975, including many in her own department. Hankes also indicated that she was interested in "A" jobs only when she was without a job. At the time of trial Hankes was working on a "B" job.

Mary Peterson stated that what she had heard about the harassment of a female employee who took an "A" job in 1970 "was a big factor" in her decision not to attempt "A" jobs. Nevertheless, she took such a job in August 1970, to avoid layoff. After 2 hours on the job she was sent to the plant nurse, who asked her to disqualify herself because of her history of back trouble. She stated at trial that she herself experienced no harassment or intimidation while working that job. Although she stated on direct examination that if there had not been intimidation or harassment, she would have attempted "A" jobs, she stated on cross-examination that she was satisfied with her "B" job, that she would prefer to have a "B" job even now,[4] and that she liked a job with less responsibility than "A" jobs.

Catherine Wermlund was one of several plaintiffs who went to look at some "A" jobs and was given a misleading description of the jobs, a description that frightened her. She took an "A" job in December 1973 to avoid layoff and, at the time of trial, was still working at an "A" job. She stated in cross-examination that she had not signed up for an "A" job earlier because she did not want to lose her departmental seniority. She had, however, changed departments in October 1972 and thus had little or no departmental seniority to lose after that change. Defendant's counsel noted that 140 "A" jobs were posted between 1970 and 1974 and that Wermlund did not investigate any of them, even those in her own department. She, like Hankes and Peterson, waited until she was threatened with layoff before she investigated taking an "A" job.

The trial court's conclusion that appellants were interested in "A" jobs only as alternatives to layoff is supported by the evidence. Although appellants mentioned that harassment and intimidation by male employees affected their decision not to take an "A" job, other factors such as desire to keep departmental seniority and preference for "B" jobs also were significant. The trial court heard all 18 plaintiffs. It was in a position to judge the credibility of the witnesses. Thus, we must believe it had some reasonable basis for ruling in favor of most of the plaintiffs, but in the case of these three plaintiffs, concluding that the decision to remain in "B" jobs did not result from defendant's discriminatory conduct. After a careful review of the record, we are not convinced that the trial court's conclusion was wrong.

2. Defendant claims that because the instant action was not filed within 90 days of the commissioner's notice that he had found no probable cause;[5] the jurisdictional requirement of Minn.St.1974, § 363.14, subd. 1, was not satisfied and the district court improperly asserted jurisdiction. Because we affirm the trial court on the issue of damages, we need not decide this second issue.

The trial court is affirmed.

OTIS and TODD, JJ., took no part in the consideration or decision of this case.

4. At the time of trial Peterson had been working on an "A" job since December of 1974. She stated at trial that she could not move into a "B" job because she did not have sufficient seniority.

5. The commissioner sent notice that he had found no probable cause on March 19 and 21, 1974. This action was filed December 19, 1974 —approximately 9 months later.