*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A16-0456**

Indira Y. Junghare,
Appellant,

vs.

The Regents of the University of Minnesota,
Respondent.

**Filed November 14, 2016**
**Affirmed**
**Cleary, Chief Judge**

Ramsey County District Court
File No. 62-CV-14-6287

Marshall H. Tanick, Teresa J. Ayling, Hellmuth & Johnson, PLLC, Edina, Minnesota (for appellant)

Douglas R. Peterson, General Counsel, Timothy J. Pramas, Senior Associate General Counsel, University of Minnesota, Minneapolis, Minnesota (for respondent)

Considered and decided by Cleary, Chief Judge; Worke, Judge; and Hooten, Judge.

## U N P U B L I S H E D   O P I N I O N

**CLEARY**, Chief Judge

Appellant Indira Y. Junghare challenges the summary-judgment dismissal of her discrimination claims against respondent, the Regents of the University of Minnesota (the university). We affirm because the district court did not err in determining there was no

genuine issue of material fact as to whether (1) appellant's discrimination claims for conduct alleged prior to the statute of limitations period were time-barred, (2) appellant could establish a prima facie case of discriminatory reprisal, and (3) respondent's stated reason for terminating appellant's employment was a pretext for discrimination.

**FACTS**

Appellant, a woman of Indian-Hindu ethnicity, was a tenured professor at the university until the termination of her employment on May 27, 2012. She specializes in South Asian languages, cultures and linguistics, and taught courses at the College of Liberal Arts (the CLA) through the Institute of Linguistics (the IoL).

Junghare claims that the university began to discriminate against her because of her race, religion, and ethnicity when in 1999 the CLA created the Department of Asian Languages and Literature (the ALL), which eventually subsumed a program in her specialty area. She alleges that the university favored other employees, particularly those of "Southeast or East Asian race, religion, and ethnicity," and that the then Associate Dean of Faculty James Parente "was involved in a campaign to marginalize and remove persons" of Junghare's ethnicity from the university.

As proof of discrimination, Junghare claims that in 2001 she applied for a position in the ALL department to continue teaching in her specialty area, but was rejected. She also claims that during the same year Parente told her that she did not "fit" at the university, and that his comment implied that this was because of her ethnicity. Junghare also alleges discrimination against her based on the university's actions of (1) ending the South Asian

2

Languages and Cultures Program in 2004; (2) rejecting her proposal to teach one literature and one culture course on South Asia in 2004; (3) assigning her "out-of-date and inappropriate courses" to teach beginning in 2006; (4) accusing her of "inciting students"; (5) moving her office to an undesirable location; (6) canceling a course assigned to her; (7) forbidding her from developing new courses and programs; and (8) removing her name from course registries.

Junghare's superiors sent her a number of letters regarding her conduct and performance at work. In August 2006, Junghare's department director requested in a letter that she change her behavior after outbursts toward coworkers. In February 2007, a previous CLA dean wrote Junghare a letter of reprimand for using a student's name without her permission in a memo that Junghare wrote and distributed. In 2008, the then CLA Dean Parente sent Junghare a written reprimand after concluding that two allegations of outbursts toward coworkers were substantiated. Junghare claims that these reprimand letters were due to her ethnicity and in retaliation for complaining of the university's alleged discriminatory practices.

On February 14, 2011, Junghare sent a letter to Bruininks, then president of the university, complaining of her course assignments and being "forcefully assigned courses . . . by a department that does not specialize in South Asian Studies."

In late February and early March of 2011, suspicious unsigned memos on university letterhead appeared in the CLA faculty and staff mailboxes. One assistant dean received such a memo purporting to be from the "Office of the Vice President for Equity and Vice

3

Provost" addressed "TO: CLA Deans." The memo, which was not from that office, stated that the office had been tasked by the university "to investigate assistant deans . . . [and] administrators . . . and their use and abuse of administrative power, and violations of faculty rights and privileges, especially of women and minority." Junghare was suspected of sending the memo because it also discussed course assignments. The IoL Director Jeanette Gundel received an unsigned letter in her campus mailbox in late February stating that "Parente uses women to carry out his dictatorial acts. He is in deep trouble by the President, [and] Office of Equal Opportunity . . . . He is a bully." The letter stated that Parente appointed Gundel, the IoL director, to "use" her, and warned, "You should give up your 'directorship.' Save yourself first. Your job is in jeopardy." Attached to the letter was a copy of Parente's offer letter to Gundel that had gone missing from her mailbox the previous year. Subsequently, a second memo purportedly sent by the same university office to Parente, or Bruininks, began to appear in faculty mailboxes. The memo accused a number of assistant deans and professors of abusing their power or "violating university policies on academic freedom," and recommended that various faculty members resign.

CLA Human-Resources Consultant Margaret Yzaguirre investigated the fake memos. On March 10, 2011, Yzaguirre asked Junghare about the memos but Junghare denied involvement. That same day, Yzaguirre seized Junghare's work computer, which was university property. Keyword searches of Junghare's hard drive revealed Microsoft Word documents that were only slightly different from the memos delivered to faculty, and one document that was an exact match to a fake memo. According to Yzaguirre, Junghare

4

asked her to "let this go," and said that sometimes certain methods had to be used to address inequities.

On March 11, 2011, Junghare again emailed Bruininks, complaining of the search of her computer and expressing her belief that the CLA would falsify evidence to bring "false charges." Bruininks replied on March 16, 2011, stating that this was a "collegiate matter," that he would defer to the dean and provost, and that Junghare could use the resources available through the Office of Equal Opportunity and the Office of Conflict Resolution.

Yzaguirre issued a report in April 2011 concluding, among other things, that Junghare intentionally created the fake memos, lied when she denied involvement, targeted certain faculty members with the memos to professionally harm them and their reputations, and refused to meet with the IoL director regarding her teaching assignments.

Parente initiated disciplinary proceedings in the fall of 2011, and proposed that Junghare be terminated from her position, per the tenure code, based on her refusal to perform reasonably assigned duties, unprofessional conduct, and other "grave misconduct." University President Eric Kaler approved Junghare's termination, effective May 27, 2012. Junghare's termination letter stated her termination was based, in part, on her creation and distribution of fake memos targeting faculty and staff, as well as her subsequent denial.

Junghare denies that she created the fake memos and believes that the university's motivation in searching her computer "was to fabricate [a] rationale for terminating [her]

employment." On May 10, 2013, Junghare filed a discrimination complaint with the Minnesota Department of Human Rights (MDHR). The MDHR conducted an investigation, found no probable cause of discrimination, and issued a right-to-sue letter to Junghare. On September 11, 2014, Junghare commenced a lawsuit in district court, alleging violations of the Minnesota Human Rights Act (MHRA). The university moved for summary judgment. No depositions were taken, and Junghare submitted an affidavit and a copy of the email she sent to Bruininks. The district court granted summary judgment in favor of the university and dismissed the lawsuit. Junghare now appeals.

## D E C I S I O N

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that either party is entitled to a judgment as a matter of law." Minn. R. Civ. P. 56.03. On appeal from summary judgment, appellate courts review de novo whether there are any genuine issues of material fact and whether the district court erred in its application of the law to the facts. *Commerce Bank v. W. Bend Mut. Ins. Co.*, 870 N.W.2d 770, 773 (Minn. 2015). The evidence is viewed in the light most favorable to the party against whom summary judgment was granted. *Id.*

No genuine issue of material fact exists for trial when the party opposing summary judgment "presents evidence which merely creates a metaphysical doubt as to a factual issue and which is not sufficiently probative with respect to an essential element . . . to permit reasonable persons to draw different conclusions." *DLH, Inc. v. Russ*, 566 N.W.2d

6

60, 71 (Minn. 1997). A party opposing summary judgment "cannot rely upon mere general statements of fact but rather must demonstrate . . . specific facts are in existence which create a genuine issue for trial." *Hunt v. IBM Mid Am. Emps. Fed. Credit Union*, 384 N.W.2d 853, 855 (Minn. 1986).

## I. Continuing Violations Doctrine

Junghare argues that the district court erred in concluding that the "continuing violations doctrine" does not apply and Junghare's discrimination claims are limited by the statute of limitations to actions occurring on or after May 10, 2012.

Under the MHRA, an employer may not discharge an employee, or discriminate with respect to hiring, tenure, compensation, terms, upgrading, conditions, facilities, or privileges of employment, "because of race, color, creed, religion, national origin, [or] sex." Minn. Stat. § 363A.08, subd. 2 (2014). A claim under the MHRA must be filed within one year of the alleged unfair discriminatory practice. Minn. Stat. § 363A.28, subd. 3 (2014). However, the continuing violations doctrine creates an exception for acts occurring prior to the limitations period when "the discriminatory acts of an employer over a period of time indicate a systematic repetition of the same policy and constitute a sufficiently integrated pattern to form, in effect, a single discriminatory act." *Hubbard v. United Press Int'l, Inc.*, 330 N.W.2d 428, 440-41 n.11 (Minn. 1983).

To establish a continuing violation, Junghare must also show that at least one discriminatory act occurred within the limitations period. *Giuliani v. Stuart Corp.*, 512 N.W.2d 589, 595 (Minn. App. 1994). When interpreting the MHRA, this court "give[s]

strong weight to federal court interpretations of Title VII claims because of substantial similarities between the two statutes." *Wayne v. MasterShield, Inc.*, 597 N.W.2d 917, 921 (Minn. App. 1999), *review denied* (Minn. Oct. 21, 1999). Under federal law, a series of "discrete acts" of an employer prior to the limitations period, even when related to the alleged discriminatory act within the limitations period, cannot establish a continuing violation. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113, 122 S. Ct. 2061, 2072 (2002). Based on the list of unlawful employment actions in Title VII, the Supreme Court determined that termination, failure to promote, denial of transfer, or refusal to hire are all "discrete acts." *Id.* at 111, 114, 2071, 2073. Under the MHRA, termination, failure to hire, and failure to promote, as well as decisions regarding compensation, are also listed as unlawful employment practices if discriminatory, and are therefore "discrete acts" under the reasoning of *Morgan*. Minn. Stat. § 363A.08, subd. 2. Because Junghare's termination was a "discrete act," she must show there is a genuine issue of material fact as to whether some other "non-discrete" discriminatory action, such as an on-going discriminatory practice, occurred within the limitations period.

Junghare claims that she endured an on-going "hostile work environment," which constituted a discrimination practice lasting up until her termination. Actions constituting a hostile work environment are not actionable unless the acts are "so severe or pervasive as to alter the conditions of the [plaintiff's] employment and create an abusive working environment." *Goins v. W. Grp.*, 635 N.W.2d 717, 725 (Minn. 2001) (quotations omitted).

> In ascertaining whether an environment is sufficiently hostile
> or abusive to support a claim, courts look at the totality of the

circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

*Id.* (quotations omitted).

Junghare's complaint and submitted affidavit create no genuine issue of material fact demonstrating a hostile work environment. She avers in her affidavit that Parente was motivated by racial animus in engineering her termination, and that he "constantly harassed and bullied [her]." But Junghare states no specific facts that create an inference of harassment or bullying. For example, she offers no factual support for why, when Parente said she did not "fit" at the university, he meant she did not fit because of her race. Junghare's affidavit also does not explain how or why the university's actions of assigning "out-of-date and inappropriate courses to teach," accusing Junghare of "inciting students," moving Junghare's office to an undesirable location, and forbidding Junghare from "developing new courses and programs" were based on Junghare's race, religion, or ethnicity.

General assertions and speculation are not sufficient to create a genuine issue of material fact for trial. *Nicollet Restoration, Inc. v. City of St. Paul*, 533 N.W.2d 845, 848 (Minn. 1995). Junghare's general assertion of "institutional discrimination" by the university and of Parente's alleged harassment are not sufficient to create a fact issue. Her hostile work environment theory further fails because there is no explanation as to how the alleged acts are threatening, humiliating or offensive, and severe or pervasive enough to create a hostile environment.

Junghare relies on *Bhd. of Ry. & S. S. Clerks v. State by Balfour*, 303 Minn. 178, 229 N.W.2d 3 (1975) and *Sigurdson v. Isanti Cty.*, 448 N.W.2d 62 (Minn. 1989), to argue that the university's alleged discriminatory actions continued up until her discharge. But in *Sigurdson*, the failure to promote the plaintiff left undisturbed a clear policy of past gender discrimination against the plaintiff. 448 N.W.2d at 68. In *Brotherhood*, the new union contract with less-desirable seniority terms and less pay for black employees was a continuation of a discriminatory policy of excluding black employees altogether from the union through a job classification system. 303 Minn. at 186-87, 229 N.W.2d at 9. Here, Junghare's allegation of "institutional discrimination" is not supported by specific facts and therefore she cannot show an undisturbed practice of discrimination like in *Sigurdson* or *Brotherhood*.

Because Junghare has not shown an example of non-discrete discrimination within the limitations period, the district court did not err in finding that all of her claims prior to May 10, 2012 are time-barred.

## II. Discriminatory Discharge Claim

Junghare next argues that the district court erred in determining that there was no genuine fact issue regarding whether she could establish a prima facie case of discrimination and whether the university's proffered reasons for termination were pretextual.

### *Prima Facie Case*

Under the MHRA, discriminatory intent may be shown using circumstantial

evidence in accordance with the three-part burden-shifting test in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824 (1973). *Hoover v. Norwest Private Mortg. Banking*, 632 N.W.2d 534, 542 (Minn. 2001). Because Junghare has not shown direct evidence of discriminatory intent, *McDonnell Douglas* applies and she has the burden of establishing a prima facie case of discrimination. *Id.* at 542.

A plaintiff makes out a prima facie case of discriminatory discharge by showing she: (1) is a member of a protected class, (2) was qualified for the position from which she was discharged, (3) was discharged, and (4) was replaced by a non-member of the protected class. *Id.* The parties only dispute the fourth prong.

Here, Junghare created a genuine issue of material fact regarding whether she was "replaced by a non-member of the protected class," by stating in her affidavit that a faculty member not of Indian-Hindu ethnicity now teaches one course she previously taught on Buddhism, and that in 2008 a Caucasian woman took over teaching one of her courses when she was reassigned.

### *Pretext*

Junghare did not show a genuine issue of material fact exists as to pretext.

> If the plaintiff makes out a prima facie case, the burden of production shifts to the defendant who, in order to avoid summary judgment, must produce admissible evidence sufficient to allow a reasonable trier of fact to conclude that there was a legitimate, nondiscriminatory reason for the discharge. If the defendant provides a legitimate, nondiscriminatory reason for its actions, the presumption of discrimination disappears and the plaintiff has the burden of establishing that the employer's proffered reason is a pretext for discrimination.

*Id.* at 542.

Junghare argues there is a genuine issue of material fact as to whether the university's stated reasons for termination were a pretext for discrimination. We disagree. An employee may show pretext by demonstrating that the "employer's proffered explanation is unworthy of credence." *Hamblin v. Alliant Techsystems, Inc.*, 636 N.W.2d 150, 153 (Minn. App. 2001), *review denied* (Minn. Feb. 19, 2002). When inquiring into whether the university's stated reasons were a pretext for discrimination, the issue is not whether Junghare actually engaged in the alleged misconduct, but whether the university had a genuine belief that she did. *Harvey v. Anheuser-Bush, Inc.*, 38 F.3d 968, 973 (8th Cir. 1994).

The university's stated reasons for termination were that Junghare (1) created and distributed fake memos targeting faculty and staff, (2) lied about creating those materials, (3) stole a letter from another employee's mailbox, (4) refused to teach an assigned course, and (5) refused to move office locations when the department was relocated. The university's investigative report and letters from Parente reveal that the university genuinely believed these nondiscriminatory reasons for its decision to terminate Junghare.

Junghare argues that because only one of four IoL faculty members voted in favor of termination, the university's reasons are unworthy of credence. But the IoL faculty did not state a belief that the university's allegations were unfounded. Some faculty members merely thought that the evidence concerning Junghare's alleged theft of a letter and fraudulent use of university letterhead was not "ironclad" enough to warrant termination.

12

Two faculty members abstained from voting, and some found it difficult to make a recommendation based on their limited interactions with Junghare. Finally, per the tenure code, Parente was not bound by the recommendation of the faculty.

Because the university's reasons for termination were not "unworthy of credence" and because the university had a genuine belief that Junghare engaged in grave misconduct, there was no genuine issue of material fact concerning pretext.

### III. Reprisal in Violation of the MHRA

The MHRA prohibits an employer from engaging in any reprisal against a person because that person filed a charge of discrimination. Minn. Stat. § 363A.15 (2014). To establish a prima facie case of reprisal, an employee must show: "(1) statutorily-protected conduct by the employee; (2) adverse employment action by the employer; and (3) a causal connection between the two." *Fletcher v. St. Paul Pioneer Press*, 589 N.W.2d 96, 101-02 (Minn. 1999). Opposing a practice forbidden under the MHRA by filing a charge of discrimination on the basis of race is statutorily-protected conduct. Minn. Stat. §§ 363A.08, subd. 2, .15.

Junghare argues that the district court erred by concluding there was no genuine fact issue that she engaged in statutorily-protected conduct. She claims that her emails to then President Bruininks were protected conduct because she was reporting discrimination. But, in the February 14, 2011 email, Junghare complained that she was "forcefully assigned courses on a regular basis by a department that does not specialize in South Asian Studies,"

13

and in the March 11, 2011 email, she complained about the seizure of her computer. Nowhere in Junghare's emails does she allege unlawful discrimination.

Junghare argues that Bruininks's March 16, 2011 response email demonstrates that he understood her email as a complaint of discrimination because he referred her to the Office of Equal Opportunity and the Office of Conflict Resolution. We disagree. Bruininks's response that Junghare's complaint was a "collegiate matter" and that he would defer to the dean, demonstrates he understood her complaint as regarding course assignments and the investigation. The referral to the Office of Equal Opportunity and the Office of Conflict Resolution was a boilerplate response to Junghare's general complaints—Parente also used similar language in a letter to Junghare in 2008—and is not sufficient evidence to create a genuine fact issue that Junghare was engaged in protected conduct. In sum, the emails are not statutorily-protected conduct.

Even if Junghare could show protected conduct, she has not shown that there was a genuine issue of material fact as to a causal connection between the conduct and the adverse employment action. Junghare argues the university's adverse action of searching her computer on March 10, 2011, was less than one month after her February 14 email to Bruininks, and that this temporal proximity demonstrates causation. But, "more than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue on retaliation." *Hervey v. Cty. of Koochiching*, 527 F.3d 711, 723 (8th Cir. 2008). Further, intervening events between the protected conduct and the adverse action will erode the causal chain in a reprisal claim. *Cheshewalla*

*v. Rand & Son Const. Co.*, 415 F.3d 847, 851–52 (8th Cir. 2005). Here, the record evidence shows that the investigation into Junghare in March 2011 actually stemmed from faculty suspicion that Junghare wrote the fake memos, her disputes with certain faculty members regarding teaching assignments, and the subject matter of the memos. Junghare's creation of the fake memos breaks any causal link between her complaints and the university's investigation.[1]

Because there is no genuine issue of fact as to whether Junghare engaged in statutorily-protected conduct or whether her complaints caused an adverse employment action, the district court did not err in dismissing the reprisal claim on summary judgment.

**Affirmed**.

---

[1] Junghare brings forth for the first time on appeal a "cat's paw" theory of discrimination, which refers to a situation in which a biased subordinate uses the formal decision maker as a "dupe" to trigger a discriminatory employment act. Generally we consider only those issues that the record shows were presented and considered by the district court. *Thiele v. Stich*, 425 N.W.2d 580, 582 (Minn. 1988). Because this theory was not argued before or considered by the district court, we will not consider it.