C. Thomas TURNER, Respondent,

v.

IDS FINANCIAL SERVICES, INC., f/k/a IDS Marketing Corporation, et al., Appellants.

No. C3–90–267.

Court of Appeals of Minnesota.

Aug. 14, 1990.

Review Granted Oct. 22, 1990.

Stephen J. Snyder, Laurie A. Knocke, Kristin L. Peterson, Winthrop & Weinstine, St. Paul, for respondent.

John D. Levine, Michael J. Wahoske, Kathleen D. Sheehy, Dorsey & Whitney, Minneapolis, for appellants.

Considered and decided by RANDALL, P.J., and FOLEY and SCHULTZ,* JJ.

## OPINION

RANDALL, Judge.

IDS Financial Services, Inc. (IDS) appeals from the denial of its motion for summary judgment on respondent C. Thomas Turner's claim of discriminatory discharge from employment. The issue raised on appeal is whether the limitations period of Minn.Stat. § 363.06, subd. 3 begins to run on such a claim the date an employee receives notice of termination or the date of discharge. The trial court ruled that the limitations period starts running on the date of discharge and certified the issue as important and doubtful for purposes of appeal pursuant to Minn.R.Civ. App.P. 103.03(h).[1] We affirm.

## FACTS

Respondent was employed by IDS for 22 years and managed the Minneapolis division of IDS for 19 of those years. On December 19, 1986, respondent was suspended from his duties pending an investigation into the perceived "religious atmosphere" in the Minneapolis office. On February 4, 1987, respondent was notified in writing that his employment would be terminated pursuant to the "without cause" provision of his contract on March 17, 1987.

Respondent did not return to work following his suspension. He was, however, paid through the effective date of termination.

Respondent subsequently commenced this action in Hennepin County District Court on January 8, 1988. He asserted five separate claims against IDS: (1) discrimination based on religious beliefs; (2) age discrimination; (3) breach of contract; (4) defamation; and (5) intentional infliction of emotional distress. IDS moved for summary judgment on all claims. The trial court granted summary judgment on the defamation, contract, and intentional infliction of emotional distress claims. The court denied the motion on the claims of religious and age discrimination under the Minnesota Human Rights Act (MHRA).

The grounds for the summary judgment motion on the MHRA claims were: (1) that respondent filed his claims more than 300 days after the discriminatory practice occurred and the claims were therefore untimely; and (2) that no issues of fact were presented by respondent's discrimination claims and IDS was entitled to summary judgment as a matter of law. With regard to the limitations issue, IDS argued that the 300-day period started on February 4, 1987, the day respondent received "unequivocal notice" of termination. The trial court, relying on *Fitzgerald v. Norwest Corp.*, 382 N.W.2d 290 (Minn.App.1986), *pet. for rev. denied* (Minn. Apr. 24, 1986), rejected this argument and concluded the limitations period started to run on March 17, 1987, the date of discharge. The court also determined that factual issues had to be resolved on both the age and religious discrimination claims. The trial court certified the limitations issue as important and doubtful for purposes of immediate appeal. IDS then petitioned the supreme court for accelerated review. The supreme court denied the petition on February 22, 1990.

## ISSUE

Did the trial court err by concluding that, in a claim of discriminatory discharge from

---

* Acting as judge of the Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 2.

1. The trial court certified the following question as important and doubtful:

In an employment discharge case, does the statute of limitations period contained in Minn.Stat. § 363.06, subd. 3 commence to run on the date of termination·or the date of notice of termination?

employment, the 300–day limitations period of Minn.Stat. § 363.06, subd. 3 begins to run on the date of discharge?

ANALYSIS

Minn.Stat. § 363.03, subd. 1 (1986) provides in relevant part:

Except when based on a bona fide occupational qualification, it is an unfair employment practice:

(2) for an employer, because of * * * religion, * * * or age,

(b) to discharge an employee[.]

Section 363.06, subd. 3 states:

A claim of unfair discriminatory practice must be brought as a civil action * * * within 300 days after the occurrence of the practice.

The supreme court has never interpreted the "occurrence of the practice" language in a situation identical to this one. But, as the trial court correctly noted, a panel of this court addressed the issue in *Fitzgerald.* Thus, we begin our analysis with a review of *Fitzgerald.*

The plaintiff in *Fitzgerald* was notified that her position was being eliminated two weeks prior to her actual discharge date. She subsequently filed an age discrimination claim under the MHRA against her former employer. The employer moved for summary judgment claiming plaintiff's action was time barred. The trial court granted the motion ruling that the "occurrence of the practice" language of section 363.06, subd. 3 referred to the date the employee received notice, citing *Chardon v. Fernandez,* 454 U.S. 6, 102 S.Ct. 28, 70 L.Ed.2d 6 (1981) (per curiam) as support for the ruling.

A panel of this court reversed, holding:

[T]he statute of limitations for Fitzgerald's age discrimination claim did not begin to run until the date of her discharge. Therefore, her claim under the Minnesota Human Rights Act was not barred by the statute of limitations.

*Fitzgerald,* 382 N.W.2d at 292. The panel recognized that the United States Supreme Court reached the opposite conclusion under federal law in *Chardon,* but concluded:

Under the particular circumstances of this case, * * * the Minnesota Supreme Court has chosen to depart from the principles used in Title VII cases.

*Id.*

The panel cited *Richardson v. School Board of Independent School District No. 271,* 297 Minn. 91, 210 N.W.2d 911 (1973), and *Buchholz v. Capp Homes, Inc.,* 321 N.W.2d 893 (Minn.1982) as support for its decision. In both cases, our supreme court held that the date of discharge triggers the statutory limitations period of Minn.Stat. § 363.06, subd. 3. *Richardson,* 297 Minn. at 98, 210 N.W.2d at 916; *Buchholz,* 321 N.W.2d at 894.

In *Richardson,* the court interpreted the occurrence of the practice language of section 363.06, subd. 3 in connection with an allegation of sex discrimination against a school district based on the district's policy of requiring all pregnant teachers to resign at the fifth month of pregnancy. The Commissioner of the Department of Human Rights filed a class action against the school district, and the limitations issue arose as the court defined the scope of the class. *Richardson,* 297 Minn. at 98, 210 N.W.2d at 916.

The court held:

We interpret the occurrence of the practice as set forth in this case to mean a discharge or required resignation, the date of which commences the statutory period of limitations. In addition, if a leave of absence were given, the statutory period would commence at the termination date of the leave of absence.

*Id.* Consequently, the court concluded that any person whose rights had been affected by the policy within six months of the date the Commissioner filed the action could be included in the class.

Nine years later, and one year after the *Chardon* case was decided by the United States Supreme Court, our supreme court reaffirmed the *Richardson* holding in *Buchholz.* There, the court stated:

We held in *Richardson* * * * that the date of the discharge commenced the running of the statutory period of limita-

tions. We adhere to that decision, and find it dispositive.

*Buchholz,* 321 N.W.2d at 894. Although the factual circumstances of *Buchholz* differ from the facts of this case, the court's statement is significant because it reveals continued allegiance to the date of discharge as the proper starting point for the statutory limitations period.

Notwithstanding the explicit holdings of these cases, IDS argues the *Fitzgerald* panel erroneously declined to follow *Chardon* because neither *Richardson* nor *Buchholz* addressed the notice of discharge/discharge issue, and because our supreme court frequently looks to United States Supreme Court interpretations of Title VII for guidance when construing provisions of the MHRA. *See, e.g., Sigurdson v. Isanti County,* 448 N.W.2d 62, 67 (Minn.1989); *Hubbard v. United Press International, Inc.,* 330 N.W.2d 428, 441 (Minn.1983); *Danz v. Jones,* 263 N.W.2d 395, 399 (Minn. 1978). Therefore, IDS asks us to abandon *Fitzgerald* in favor of *Chardon* and *Delaware State College v. Ricks,* 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980).

To fully address IDS's argument, we must examine the reasoning of *Ricks* and *Chardon. Ricks* was a claim of discriminatory denial of tenure by a black Liberian college professor under Title VII. The College's Board of Trustees voted to deny Ricks tenure, and pursuant to its policy of offering junior faculty members one-year "terminal" contracts upon denial of tenure, offered Ricks a "terminal" contract on June 26, 1974. The contract expired on June 30, 1975. The issue before the Court was when the 180–day limitations period of Title VII started running on Ricks's cause of action.

The Court held that the limitations period commenced when the final tenure decision was made and communicated to Ricks. *Ricks,* 449 U.S. at 259, 101 S.Ct. at 504. The Court rejected the claim that the limitations period started on the date the employment contract expired reasoning that the proper focus was on "the time of *discriminatory acts,* not upon the time at which the acts became most painful." *Id.*

at 258, 101 S.Ct. at 504 (quoting *Abramson v. University of Hawaii,* 594 F.2d 202, 209 (9th Cir.1979) (emphasis added)). Because "the only allegedly discriminatory act [was] the denial of tenure," *id.* 449 U.S. at 258 n. 9, 101 S.Ct. at 504 n. 9, the Court held the limitations period started to run when Ricks was offered a "terminal" contract on June 26, 1974. At that point, Ricks had clearly been informed that he would be denied tenure. Therefore his Title VII claim was filed too late. *Id.* at 261–62, 101 S.Ct. at 505–06.

One year later, in *Chardon,* the Court extended the holding of *Ricks* to an employment discharge case. The Court held that the limitations period on claims of illegal discharge from employment started to run when employees received notice "that a final decision had been made to terminate their appointments." *Chardon,* 454 U.S. at 8, 102 S.Ct. at 29. The Court reasoned:

> The fact of termination is not itself an illegal act. * * * Here, respondents allege that the decision to terminate was made for solely political reasons, violative of First Amendment rights. There were no other allegations * * * of illegal acts subsequent to the date on which the decisions to terminate were made.

*Id.*

The dissents in both *Ricks* and *Chardon* argued that the date of discharge was the proper date on which the limitations period should begin to run. Justice Stevens wrote:

> The most sensible rule would provide that the date of discharge establishes the time when a cause of action accrues and the statute of limitations begins to run. Prior to that date, the allegedly wrongful act is subject to change; more importantly, the effective discharge date is the date which can normally be identified with the least difficulty or dispute.

*Ricks,* 449 U.S. at 265, 101 S.Ct. at 508 (Stevens, J., dissenting). Justice Brennan's dissent in *Chardon* criticized the majority's decision to extend the holding of *Ricks* to a discharge case. He stated:

It is one thing to hold, as was held in *Delaware State College v. Ricks, * * ** that for the purpose of computing the limitations period, a cause of action for denial of a benefit such as tenure, and consequent damage, accrues when the plaintiff learns that he *has been* denied that benefit; it is quite another to hold, as the Court does here, that a cause of action for damages resulting from an unconstitutional termination of employment accrues when the plaintiff learns that he *will be* terminated.

*Chardon*, 454 U.S. at 9, 102 S.Ct. at 29 (Brennan, J., dissenting). Brennan predicted that the likely effect of the ruling

> will be to increase the number of unripe and anticipatory lawsuits * * * lawsuits that should not be filed until some concrete harm has been suffered * * *.

*Id.*

IDS points out that since *Ricks* and *Chardon* were decided, federal courts have uniformly applied the notice rule in both Title VII [2] and age discrimination cases.[3] IDS strongly asserts that we should adopt the reasoning of *Ricks* and *Chardon*, while respondent contends we should follow the explicit holdings of *Richardson, Buchholz,* and *Fitzgerald.*

We decline to extend the reasoning of *Ricks* to an employment discharge case as the Court did in *Chardon.* We are not bound to follow United States Supreme Court interpretations of Title VII when construing and applying the MHRA. As our supreme court stated:

> [R]eliance on federal Title VII decisions as a guide at times does not necessarily mean that adherence to positions advanced in those decisions constrain this court as binding precedent in the interpretation of our state statute.

*Carlson v. Independent School District No. 623*, 392 N.W.2d 216, 220 (Minn.1986). For the following reasons, we reject IDS's claim that the statutory limitation's period of Minn.Stat. § 363.06, subd. 3 should begin to run on the date an employee receives notice of a future termination.

First, the plain language of the MHRA states that it is an unfair employment practice to *discharge* an employee based on impermissible considerations such as age or religion. Minn.Stat. § 363.03, subd. 1(2)(b). Thus, when a claim of discriminatory discharge from employment is made, *the most logical date on which to start the limitations period is the date of discharge.* Until that date, no unfair employment practice within the meaning of Minn.Stat. § 363.03, subd. 1(2)(b) has taken place. This situation is plainly distinguishable from an allegedly discriminatory denial of tenure, as in *Ricks,* or of some other employment benefit such as sick leave benefits. *See Biltz v. Northwest Airlines, Inc.*, 363 N.W.2d 94 (Minn.App.1985).[4] Once tenure

---

2. *See Nazaire v. Trans World Airlines, Inc.*, 807 F.2d 1372 (7th Cir.1986), *cert. denied*, 481 U.S. 1039, 107 S.Ct. 1979, 95 L.Ed.2d 819 (1987); *Shockley v. Vermont State Colleges*, 793 F.2d 478 (2d Cir.1986) (timeliness measured from date claimant receives notice); *Davis v. Sears, Roebuck and Co.*, 708 F.2d 862 (1st Cir.1983) (time begins to run on date of notice of discriminatory dismissal).

3. *See Wilson v. Westinghouse Electric Corp.*, 838 F.2d 286, 288 (8th Cir.1988) (limitations period commences when the plaintiff receives notice of a termination decision); *Mull v. Arco Durethene Plastics, Inc.*, 784 F.2d 284, 288 (7th Cir.1986) (unequivocal notice of termination is required to start the limitations period running); *Miller v. International Telephone and Telegraph Corp.*, 755 F.2d 20, 23–24 (2d Cir.1985), *cert. denied*, 474 U.S. 851, 106 S.Ct. 148, 88 L.Ed.2d 122 (1985) (limitations period commences when plaintiff receives definite notice of the termination); *Price v. Litton Business Systems, Inc.*, 694 F.2d 963, 965 (4th Cir.1982) (limitations period runs from date employee is informed of the allegedly discriminatory employment decision).

4. IDS also contends that the holding of *Fitzgerald* conflicts with the holding of *Biltz.* We disagree. *Biltz* involved a claim of allegedly discriminatory denial of sick leave benefits. A panel of this court affirmed the trial court's ruling that the limitations period started running when the benefits were denied not when the employee was terminated. *Biltz,* 363 N.W.2d at 96–97. We see no conflict between the holdings of *Fitzgerald* and *Biltz.* Both cases focus on the discriminatory act as the point at which the statutory limitations period commences. *Fitzgerald* simply concludes that the discriminatory act in a discharge case is the actual discharge; *Biltz* holds that the discriminatory act in a denial of benefits case is the date the benefit is denied.

or some other employment benefit has been discriminatorily withheld, the unfair employment practice is complete. *See* Minn. Stat. § 363.03, subd. 1(2)(c). Although we acknowledge there may be overlap at times, it seems to us the cleanest way to handle a discharge situation is to find that for computing the time limitation to sue, the unfair practice is not simply the decision to terminate, but the implementation of that decision that results in an actual discharge. Therefore, we conclude that the occurrence of the practice language of Minn.Stat. § 363.06, subd. 3 refers to the actual discharge date not the date an employee receives notice of a future discharge. *See Tuma v. Commissioner of Economic Security*, 386 N.W.2d 702, 706 (Minn.1986) (court's duty is to give effect to statute's plain meaning where words are clear); *see also Fitzgerald*, 382 N.W.2d at 292 (declining to follow *Chardon*); *Board of Education v. Ohio Civil Rights Commission*, 66 Ohio St.2d 252, 421 N.E.2d 511 (1981) (Ohio Supreme Court refused to apply notice rule of *Ricks* in a claim of discriminatory nonrenewal of teaching contracts).

Second, the underlying purposes of the MHRA are best served by interpreting the "occurrence of the practice" language to refer to the date of discharge in this factual setting. One of the purposes of the MHRA is to prohibit employment discrimination. Minn.Stat. § 363.03, subd. 1. Individuals subjected to employment discrimination are entitled to bring civil actions for damages. The purpose of providing for such an action is "to place individuals discriminated against in the same position they would have been in had no discrimination occurred." *Brotherhood of Railway & Steamship Clerks, Freight Handlers, Express & Station Employees, Lodge 364 v. State*, 303 Minn. 178, 195, 229 N.W.2d 3, 13 (1975). We must construe the provisions of the MHRA broadly to further its underlying purposes. Minn.Stat. § 363.11 (1986). The underlying purposes of the Act

will be furthered if the statutory limitations period is construed in a manner that allows MHRA claimants, such as respondent, to have their actions determined on the merits. *See Sorenson v. St. Paul Ramsey Medical Center, Inc.*, 457 N.W.2d 188, 192 n. 5 (Minn.1990) (recognizing importance of deciding cases on the merits). Adopting the date of discharge as the triggering event for the statute of limitations will have that result.

Third, the legislature has amended the MHRA since *Fitzgerald* held the limitations period of section 363.06, subd. 3 begins to run on the date of discharge without disturbing the *Fitzgerald* panel's interpretation of the statute.[5] IDS contends legislative inaction has no significance because the legislature always intended the "occurrence of the practice" language to be construed consistently with federal court interpretations of Title VII. We disagree. The legislature has not instructed state courts to adhere to federal court interpretations of Title VII when construing provisions of the MHRA even though the legislature has done so in other areas. *Carlson*, 392 N.W.2d at 220–21. Additionally, although the legislature has shown particular "sensitivity to judicial decisions that might affect application of the act," *id.* at 221, the legislature has *not* demonstrated any disapproval of *Fitzgerald*.

Finally, adopting the date of discharge as the event which triggers the running of the statutory limitations period provides an easily discernable and logically defendable bright-line rule. Prior to the date of actual discharge, the impending allegedly wrongful act may, in fact, never take place and, because of any number of variables, there may be no damages. When the offending notice has merely been sent but nothing else has happened, you could have a change of mind by the employer, a satisfactory resolution between employee and employer over the problem, or possible negotiations between employer and employee

---

5. *See* 1988 Minn. Laws ch. 660, § 6 (amending section 363.06, subd. 3 to lengthen limitations period from 300 days to one year); 1990 Minn. Laws ch. 567, § 8 (adding subdivision 3a to

Minn.Stat. § 363.06 providing that first application of unfair discriminatory practice establishes basis for filing claim).

leading to a mutually agreeable termination of employment.[6] Adopting a notice rule will give rise to another substantial layer of litigation concerning "what constitutes notice." Experienced litigators will sue over whether "the notice given" was clear and unequivocal, whether the person providing the notice had actual authority to discharge, whether it was merely a notice to terminate or a notice that "unless you make certain changes in your work practices you will then be terminated," and so on ad infinitum. *See Chardon*, 454 U.S. at 9, 102 S.Ct. at 29 (Brennan, J., dissenting); *Ricks*, 449 U.S. at 265, 101 S.Ct. at 507 (Stevens, J., dissenting). Furthermore, the bright-line provided by adopting the date of discharge as the triggering event for the limitations period coincides with the express statutory language which makes it illegal to *discharge* an employee based on impermissible considerations. *See* Minn. Stat. § 363.03, subd. 1(2)(b).

IDS argues that our holding will undercut the protection the legislature provided employers by imposing a short limitations period on MHRA claims. The relatively brief limitations period is designed to "protect employers from the burden of defending claims arising from employment decisions that are long past." *Ricks*, 449 U.S. at 256–57, 101 S.Ct. at 503. The legislature's decision to impose a short limitations period reflects

> a value judgment concerning the point at which the interests in favor of protecting valid claims are outweighed by the interests in prohibiting the prosecution of stale ones.

*Id.* at 260, 101 S.Ct. at 505 (quoting *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 463–64, 95 S.Ct. 1716, 1722, 44 L.Ed.2d 295 (1975)).

We are not persuaded by this argument. The facts of this case demonstrate that IDS has not been required to defend against a stale claim due to the interpretation of section 363.06, subd. 3 adopted in

*Fitzgerald.* IDS notified respondent of his impending discharge on February 4, 1987. The discharge took effect on March 17, 1987. Respondent filed his MHRA claims on January 8, 1988, less than one year after notification and less than 300 days from the actual discharge date. IDS's proposed construction of the statute would insulate it from liability for what it considers a meritless claim. The construction we give the statute today is consistent with the legislature's expressed desire to have provisions of the MHRA construed liberally to further its underlying purposes.

Based on the foregoing, we hold that the "occurrence of the practice" language of section 363.06, subd. 3 refers to the date of discharge when the allegedly unfair employment practice is a discriminatory discharge. This strikes a proper balance between the interests of employers to be free of "stale claims" resulting from "long past" employment practices and the rights of employees to seek redress for allegedly discriminatory employment practices under our state human rights act. Accordingly, the trial court's decision to deny IDS's motion for summary judgment is affirmed.

### DECISION

The trial court did not err by denying IDS's motion for summary judgment on respondent's MHRA claim.

Affirmed.

FOLEY, Judge (dissenting).

I respectfully dissent. Claims for unfair discriminatory practices under the Minnesota Human Rights Act (MHRA) must be brought "within 300 days after the occurrence of the practice." Minn.Stat. § 363.06, subd. 3 (1986). Our Supreme Court has not interpreted the "occurrence of the practice" language in a case in which an employee received notice of termination prior to the actual date of termination.

---

**6.** Our decision will not prevent an employee from commencing an action upon receiving notice of an allegedly discriminatory discharge. We merely hold that the statute of limitations does not begin to run on the employee's claim until the date of discharge. Employees will be free to seek injunctive relief prior to the date of discharge if they can convince a court of jurisdiction that temporary or permanent injunctive relief is appropriate.

The United States Supreme Court has construed nearly identical language in Title VII of the Civil Rights Act. In *Delaware State College v. Ricks*, 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980), a college professor was denied tenure, but his employment was not terminated until one year later. After his employment was terminated, he filed a claim against his employer under Title VII. The Court interpreted the language of 42 U.S.C. § 2000e–5(e) that a claim must be filed within one year "after the alleged unlawful employment practice occurred." *Id.* at 257, 101 S.Ct. at 504. It held the statute of limitations began to run when the professor received notice that he was denied tenure. *Id.* at 259, 101 S.Ct. at 504. The Court stated that "the proper focus is upon the time of the *discriminatory acts,* not upon the time at which the *consequences* of the acts become most painful." *Id.* at 258, 101 S.Ct. at 504 (quoting *Abramson v. University of Hawaii,* 594 F.2d 202, 209 (9th Cir.1979) and adding emphasis).

One year later in *Chardon v. Fernandez,* 454 U.S. 6, 102 S.Ct. 28, 70 L.Ed.2d 6 (1981), the Court extended the notice rule to an employment discharge case. In *Chardon,* nontenured school administrators who received unequivocal notice that their employment would be terminated at specified later dates filed a lawsuit against their employer. The Court held the statute of limitations began running when the administrators received notice "that a final decision had been made to terminate their appointments." *Id.* at 8, 102 S.Ct. at 29. The rationale underlying the decision was that the decision to terminate the administrators' employment for allegedly improper reasons was an illegal act. *Id.* As the majority opinion notes, federal courts have uniformly applied the *Ricks* and *Chardon* notice rule in both Title VII and age discrimination claims.

This court applied the notice rule in *Biltz v. Northwest Airlines, Inc.,* 363 N.W.2d 94 (Minn.App.1985). Biltz, who was diagnosed as an alcoholic and pronounced unfit for his job, was placed on personal leave pursuant to the terms of his employment contract. In March 1977 his employer de-

nied his request for sick or medical leave. *Id.* at 96. After being terminated effective February 7, 1978, Biltz filed a claim against his employer for violations of the MHRA on July 13, 1978. *Id.* The *Biltz* court held the statute of limitations began running when Biltz received notice that his request for sick or medical leave had been denied. *Id.* at 96–97. Citing *Chardon* with approval, the court stated:

This case does not present a "continuing violation," for what Biltz suffered in 1978 was only the consequence of [his employer's] 1977 decision. The United States Supreme Court held that in Title VII discrimination cases, the applicable limitations period begins to run when the discriminatory act occurs, not when the consequences of the act become painful.

*Id.*

The *Biltz* holding conflicts with the holding of another case from this court, *Fitzgerald v. Norwest Corp.,* 382 N.W.2d 290 (Minn.App.1986), *pet. for rev. denied* (Minn. Apr. 24, 1986). The *Fitzgerald* plaintiff, who received notice of discharge two weeks before the effective termination date, filed an age discrimination claim under the MHRA against her former employer. This court held the statute of limitations did not begin to run until the date of her discharge. *Id.* at 292. To reach its decision, the *Fitzgerald* court relied on *Richardson v. School Board of Independent School District No. 271,* 297 Minn. 91, 210 N.W.2d 911 (1973) and *Buchholz v. Capp Homes, Inc.,* 321 N.W.2d 893 (Minn. 1982). That reliance is misplaced. Neither the *Richardson* court nor the *Buchholz* court interpreted the phrase "occurrence of the practice" in the context of this case. There was no dispute in either case about whether the statute began to run on the date of notice or the date of discharge.

The issue in *Richardson* was whether a school district's policy of forcing pregnant teachers to resign at the fifth month of pregnancy was a continuing violation of the MHRA so as to make the statute of limitations inapplicable. Our supreme court concluded that the policy was not a continuing violation and stated that the statute began

to run when there was no further expectation of continued employment. *Richardson*, 297 Minn. at 98, 210 N.W.2d at 916. In *Buchholz* the issues were whether a 1981 amendment to Minn.Stat. § 363.06, subd. 3 was retroactive and whether the amendment eliminated the statute of limitations for certain actions brought under the MHRA. *Buchholz*, 321 N.W.2d at 894–95.

Because our supreme court has not interpreted the phrase "occurrence of the practice" in the context of this case, I believe the better reasoned and more consistent approach to this case would be to interpret the statutory language in light of federal decisions interpreting nearly identical language in Title VII. The Minnesota Supreme Court frequently follows federal cases interpreting Title VII when construing provisions of the MHRA. For example, the court recently cited *Ricks* with approval and followed federal decisions on the issue of whether a discriminatory job classification was a single act or continuing violation. *Sigurdson v. Isanti County*, 448 N.W.2d 62, 66–68 (Minn.1989). *See also Anderson v. Hunter, Keith, Marshall & Co.*, 417 N.W.2d 619, 626–30 (Minn.1988) (following Title VII law in defining right to recover back pay and attorney's fees under MHRA); *Sigurdson v. Isanti County*, 386 N.W.2d 715, 722 (Minn.1986) (adopting Title VII standard for determining meaning of "reasonable attorney's fees" under Minn. Stat. § 363.14, subd. 3 (1984)).

Policy considerations also support adoption of the *Ricks* and *Chardon* notice rule. First, the notice rule protects employers from the burden of defending claims arising from long-past employment practices. *Ricks*, 449 U.S. at 256–57, 101 S.Ct. at 503–04. Second, in cases in which several employees receive notice of discharge on the same date but the effective date of termination is different for each, the notice rule will allow all employees the same amount of time to file a claim. Third, employers may be discouraged from giving any notice at all if notice extends their potential exposure to lawsuits.

Here, the illegal act was the decision to terminate Turner for allegedly improper reasons in violation of the MHRA. Turner received unequivocal notice of that decision in writing on February 4, 1987. He did not commence this action until January 8, 1988. I would hold that this action is barred by the 300 day statute of limitations contained in Minn.Stat. § 363.06, subd. 3.

In light of the conflict among decisions from this court, the consistent federal decisions, and the steady run of cases on the issue, I respectfully request our supreme court decide whether unequivocal notice or date of discharge triggers the statute of limitations contained in Minn.Stat. § 363.06, subd. 3. Alternatively, it would be helpful if the legislature clarified the statutory language to explicitly indicate whether "occurrence of the practice" refers to notice or date of discharge.